Filed 8/11/14  P. v. Armstrong CA3

## NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C064420 |
| Plaintiff and Respondent, | (Super. Ct. No. 07F07665) |
| v. | |
| NORWOOD ARMSTRONG, | |
| Defendant and Appellant. | |

Defendant Norwood Armstrong appeals following conviction of forcible oral copulation (Pen. Code, § 288a, subd. (c)(2)[1] (Counts One and Two)), forcible rape (§ 261, subd. (a)(2)(Count Three), second degree robbery (§ 211 (Count Four)), and kidnapping to commit sex offenses (§ 209 (Count Five)), with true findings on allegations that he personally used a firearm on all counts (§§ 12022.53, subd. (b)), and as to Counts One through Three, that he kidnapped the victim to commit a sex offense (§ 667.8), that

---

[1] Undesignated statutory references are to the Penal Code in effect at the time of defendant's crimes.

1

the movement increased the risk of harm (§ 667.61, subd. (a) and (d)(2)), and in connection with the oral copulation and rape he kidnapped the victim and used a gun (§ 667.61, subd.(a) and (e)(1)(4)). Combined with an unrelated robbery case, defendant was sentenced to a total determinate sentence of 92 years 8 months, plus an indeterminate term of 25 years to life.

On appeal, defendant contends the trial court erred by: (1) allowing DNA evidence of "random match probability" in this "cold hit" case, where the suspect was not randomly identified but was discovered in a database search of DNA profiles maintained by law enforcement; (2) excluding evidence to impeach prosecution DNA experts; (3) admitting evidence of possession of a different gun on different occasion to show defendant had access to guns; (4) instructing the jury on flight; (5) failing sua sponte to dismiss the second degree robbery count on the ground that it was time-barred by the statute of limitations; (6) instructing and sentencing on enhancements for kidnapping to commit a sex offense; (7) imposing jail classification and booking fees; (8) failing to update conduct credit for time served when defendant was resentenced on the unrelated robbery case; and (9) stating a midterm rather than a lower term sentence in the abstract of judgment on the unrelated robbery case.

We reverse the judgment on Count Four, second degree robbery, because prosecution on that count was barred by the statute of limitations, stay the sentence on the section 667.8 enhancements for kidnapping to commit a sex offense, strike the jail/booking fees, and remand for resentencing and calculation of conduct credits. We otherwise affirm the judgment.[2]

---

[2] On November 10, 2010, defendant filed in this court a request for judicial notice of a document excluded from evidence by the trial court--a Department of Justice memorandum from an unrelated case (*People v. Smith* (Sept. 29, 2011, C062513) [nonpub. opn.]), criticizing a prosecution expert who testified in this case. The People oppose judicial notice. We grant the request for judicial notice but as will become apparent, it does not help defendant's appeal.

**FACTUAL AND PROCEDURAL BACKGROUND**

An amended information filed January 21, 2010, charged defendant with the commission of crimes against one victim, Christy R., on July 22, 2001,[3] as follows:

**Count One**--forcible oral copulation (§ 288a, subd. (c)(2)) (defendant's penis to victim's mouth);

**Count Two**--forcible oral copulation (§ 288a, subd. (c)(2)) (defendant's mouth to victim's vagina);

**Count Three**--forcible rape (§ 261, subd. (a)(2));

**Count Four**--second degree robbery (§ 211);

**Count Five**--kidnapping to commit a sex offense (§ 209, subd. (b)(1)).

Several enhancement allegations were also alleged. The information alleged defendant personally used a firearm on all counts (§ 12022.53, subd. (b)). As to the sex offenses in Counts One, Two and Three, the information alleged defendant kidnapped the victim to commit the sex offenses (§ 667.8, subd. (a)), that the defendant kidnapped the victim in violation of section 207 and that the movement substantially increased the risk of harm to the victim (§ 667.61, subds. (a) & (d)(2)), that defendant kidnapped the victim in violation of section 207 and personally used a deadly weapon or firearm in violation of section 12022.3, subdivision (a) (§ 667.61, subds. (a), (e)(1), & (4).)

**Trial Evidence**

Victim Christy R. testified that, on July 22, 2001, around 4:00 a.m., she drove to a friend's apartment. After she parked and got out of the car, someone came out of the

---

[3] Defendant's brief alternately describes the crimes as happening on January 22 and July 22. Oddly enough, the reporter's transcript shows the prosecution referring to both January and July in questioning the victim at trial. We use July 22 because that is the month used in the information, and July 22 is the date referenced in the testimony of the responding police officer and the testimony of the nurse practitioner who performed the sexual assault examination on the victim.

bushes. Startled, she dropped her handbag and keys and told the man, "You scared me." The man displayed a black handgun, a revolver, with a barrel approximately six-inches long and told her to be quiet. He asked if she had money, and she said no. The man then said he wanted to go somewhere darker and more secluded. Afraid, she agreed to do whatever he wanted. He made her drive around the corner and park in a darkened residential area, while holding a gun to her head from the backseat. After she parked, he asked again for money, and she said she had none. He said, "Fine, then you're going to have to please me sexually." While still pointing the gun at her head, he told her to climb over the front seat to the back seat and orally copulate him. After she got into the backseat, defendant told her to orally copulate him and she complied. When she asked him to use a condom, he retorted he was going to "F you in your butt or ass now that you asked that." Defendant told the victim to climb on top of him and he inserted his penis into her vagina. After intercourse, he ejaculated onto the car seat. According to the victim, defendant was "upset and freaking out" because he ejaculated. He used her sweatshirt to wipe it up. At some point during this episode defendant also orally copulated the victim. After the sex acts were over, he told her to lie on the floor and count to a thousand or he would shoot her. He took her driver's license and ATM card and said if she called the police, he would come find her. He also took the sweatshirt he used to wipe his ejaculate off the seat.

The victim could not identify the perpetrator because he would not let her look at him, but she told police he was a black male, mid-thirties, about six feet one inch tall, about 180 pounds, with a mustache and scruffy facial hair, like it was unshaven. She testified that she thought she also told an officer that the man had a haircut about two inches long. The parties stipulated that, at the time of the offense, defendant was 26 years old, about five feet ten inches tall, and about 190 pounds.

In August 2001, county criminalist Jeffrey Herbert analyzed one of three vaginal swabs taken from the victim for DNA. He separated the sperm fraction and developed a

4

13-loci DNA profile for the major donor. Herbert then uploaded the DNA profile to CODIS (combined DNA index systems) database. By the time of trial,[4] the State CODIS database included DNA samples from one to two million people, and the national CODIS database had about seven million people.

The database searches for matching profiles. If it finds a match (a hit), a criminalist confirms the match, DOJ gives the name of the person to the investigating agency, and the investigating agency applies for a warrant to obtain a "reference sample" from that person. The crime lab develops a DNA profile of the reference sample and compares it to the "evidence sample" from the crime.

The identity of the person whose profile had been uploaded to CODIS remained unknown between 2001 and 2007. In February 2007, CODIS produced a single hit, which led to defendant. In April 2007, law enforcement obtained a reference sample from defendant. Herbert developed a 15-loci profile (made possible by technological advances over the previous testing done in 2001 which only covered 13-loci). The profile matched the sperm fraction profile from the vaginal swab. Looking at 13 loci and using random match probability, Hebert testified that the major profile developed from the sperm fraction of the vaginal swab he tested was estimated to occur at random among unrelated individuals in approximately one in two trillion African Americans, one in 48 trillion Caucasians, and one in 60 trillion Hispanics.

Herbert acknowledged he no longer does DNA analysis due to his violating protocol by failing to book evidence properly in this case. He also admitted he worked on an unrelated criminal case, *People v. Smith, supra*, C062513 [nonpub. opn.], in which he performed a second DNA test with results more favorable to the defendant but did not disclose the second test, even to the prosecution. He testified it was not laboratory

---

[4] The evidence does not disclose how many people were in CODIS at the time of the cold hit.

5

protocol to do so. He also said his testimony in the *Smith* case was in conformity with laboratory procedures at the time and procedures have since changed. On redirect examination, Herbert said the *Smith* case involved a calculation called combined probability of inclusion (CPI) applied to the analysis of mixed samples, which is not at issue in this case.

County DNA analyst Deven Johnson testified that, in 2009, she conducted a DNA analysis on one of the three vaginal swabs from the victim that Herbert had not analyzed. She also tested the previously untested stains on the three cuttings taken from the back seat of the victim's car. The sperm fraction of the vaginal swab and car seat were not mixed samples. Johnson also retested defendant's reference sample and developed a 15-loci profile of defendant's DNA. Johnson determined that defendant's profile matched the profile from the vaginal swab and the car seat cuttings. Using random match probability, the 15-loci profile from defendant's reference sample and the sperm fraction from the vaginal swab and the car seat cuttings, would occur at random among unrelated individuals in approximately one in 900 trillion of the African-American population, one in seven quadrillion of the Caucasian population, and one in 16 quadrillion of the Hispanic population.

In August 2007, the victim was shown a photo lineup containing defendant's photograph. Prior to showing her the photo lineup, the officer asked her if she still remembered what the man looked like and she said, "vaguely, I would probably remember now if I saw a picture" and "for some reason the face now is stuck in my head. I don't know why." When shown the lineup, however, she was unable to identify anyone. She pointed to a photo of someone other than defendant and stated to the officer, "I just remember it looked like him," "meaning the facial hair but I don't know." As for the subject she pointed to, the victim testified, "out of anyone he looks more like just because of the facial hair in itself. That was the only reason why." As depicted in the photo line-up, defendant had a shaved head.

6

Defendant and his girlfriend P.W., since the summer of 2001, were stopped by law enforcement in an unrelated traffic stop on May 2, 2002. Defendant's head was shaved, but P.W. told the police that up until a few months before the traffic stop, defendant wore his hair about two and half inches long and he always wore a mustache and little goatee.

A sheriff's deputy found a loaded semiautomatic handgun in a paper bag on the front seat during the traffic stop. During the August 2007 interview in which the victim was shown the photo line-up, she recalled that the handgun with which she had been threatened was a revolver.

Though the victim testified the perpetrator used a revolver, the jury heard evidence, over defense objection, that defendant had the semiautomatic handgun on the occasion of the 2002 traffic stop. P.W. testified that during her relationship with defendant she saw him with a gun, but she claimed she could not recall telling the police that defendant habitually carried a gun in a paper bag. The officer who interviewed P.W. said she told him defendant had carried a gun since she met him, and he always carried a gun in a paper bag or fast food bag.

The defense did not call any witnesses.

### Verdicts and Sentencing

The jury found defendant guilty on all counts and found true all enhancement allegations.

In March 2010, the trial court sentenced defendant to an indeterminate term as follows:

**Count One--oral copulation:** 25 years to life pursuant to section 667.61, subdivisions (a) and (d)(2), oral copulation during a kidnapping that increased the risk to the victim over the level of risk inherent in the oral copulation, plus a 10-year firearm enhancement. (§ 12022.53, subd. (b).)

7

The court also sentenced defendant to full term consecutive determinate terms[5] totaling 82 years 8 months as follows:

**Count Two--oral copulation:**  the upper term of eight years, plus a 10-year firearm enhancement (§ 12022.53, subd. (b)) and a nine-year enhancement for kidnapping to commit a sex offense (§ 667.8);

**Count Three--rape**:  the upper term of eight years, plus a 10-year firearm enhancement (§ 12022.53, subd. (b)) and a nine-year enhancement for kidnapping to commit a sex offense (§ 667.8);

**Count Four**--**robbery**:  designated as the principal term and sentenced under section 1170.1, subdivision (a), the upper term of five years, plus a 10-year firearm enhancement (§ 12022.53, subd. (b)); and

**Count Five--kidnapping to commit a sex offense**:  life with possibility of parole, plus a 10-year firearm enhancement (§ 12022.53, subd. (b)), both stayed pursuant to section 654.

The trial court also re-sentenced defendant on a prior robbery case (case No. 00F04732) for which he had received a 29-year sentence.  The new sentence on the prior case was a consecutive term of 13 years 8 months (two years; plus a gun enhancement of six years, eight months; plus five years under section 667, subd. (a)).

Thus, the total determinate sentence is 92 years 8 months, plus the indeterminate term of 25 years to life.  The trial court did not award defendant any credits on the 2005 case.

---

[5]  The trial court noted defendant was subject to consecutive sentencing under section 667.6, subdivision (c), which authorizes full term consecutive sentencing for sex offenses in lieu of the term provided in section 1170.1.

## DISCUSSION

## I. DNA Evidence

Defendant argues the trial court erred by allowing the prosecution to present evidence of random match probability in a cold-hit case. According to defendant, the court in *People v. Nelson* (2008) 43 Cal.4th 1242 (*Nelson*) held that product rule calculations[6] are admissible in a cold-hit case only as rarity statistics, but are irrelevant, misleading, and inadmissible to prove random match probability. Defendant contends the purportedly misleading presentation of DNA evidence violated his federal due process rights.

We conclude defendant's reading of *Nelson* is wrong and that the trial court did not err in admitting random match probability evidence, and even assuming defendant's reading of *Nelson* is correct, any error was harmless because the rarity statistics are compelling.

## A. Background

The defense moved in limine (1) to exclude claims of "source attribution"[7] between defendant's DNA profile and the crime scene DNA profile as not generally

---

[6] "Product rule" calculates the rarity of the sample in the relevant population. (*Nelson, supra,* 43 Cal.4th at p. 1259.) " 'The frequency with which each measured allele appears in the relevant population is estimated through the use of population databases. . . . The frequencies at each tested locus are multiplied together to generate a probability statistic reflecting the overall frequency of the complete multilocus profile. . . . The result reflects the frequency with which the complete profile is expected to appear in the population. . . . The result is sometimes expressed as the probability that the DNA of a person selected at random from the relevant population would match the evidentiary sample at all tested loci. . . .' " (*Ibid.*)

[7] Source attribution refers to expert opinion testimony that an evidentiary sample was left by the defendant. (*People v. Cua* (2011) 191 Cal.App.4th 582, 599 [holding that an expert can testify to the identity of a defendant's DNA profile with that contained in an evidentiary sample and recognizing that other courts have also held, dependent upon the strength of a match, " 'it might be appropriate for the expert to testify that, except for identical twins or maybe close relatives, " 'it can be concluded to a reasonable scientific

9

accepted in the scientific community, (2) to exclude the question "How many worlds would it take before you saw this profile again," because the question related to random match probability was misleading and without factual or scientific basis, (3) to introduce evidence of prior mistakes by prosecution experts, (4) to introduce evidence of the DOJ database search that led to his identification, on the ground that identifying a suspect by "trawling through a database" is known to have the potential for identifying the wrong person, and (5) to exclude hearsay of DNA testing by anyone who does not testify. As to the database search, defendant cited the preliminary hearing transcript, where the prosecution's DNA expert acknowledged that searching a database of 200,000 individuals increases the chance of a random match by 200,000. Defendant also noted the following from a 1996 National Research Council report (NRC II)[8]:

"There is an important difference [where] the suspect is initially identified by searching a database [and] the calculation of a match probability . . . should take into account the search process. . . . [¶] . . . [¶] To see the logical difference . . . observe that if we toss 20 reputedly unbiased coins once each, there is roughly one chance in a million that all 20 will show heads. According to standard statistical logic, the occurrence of this highly unlikely event would be regarded as evidence discrediting the hypothesis that the coins are unbiased. But if we repeat this experiment of 20 tosses a large enough number of times, there will be a high probability that all 20 coins will show heads in at least one experiment. In that case, an event of 20 heads would not be unusual and would not in itself be judged as evidence that the coins are biased. The initial identification of a suspect through a search of a DNA database is analogous to performing the coin-toss

---

certainty that the evidence sample and the defendant sample came from the same person' "]; see *id*. at pp. 597, 601.)

[8] NRC is a private nonprofit society of scholars, administered by the National Academy of Sciences, the National Academy of Engineering, and the Institute of Medicine. (*People v. Soto* (1999) 21 Cal.4th 512, 536, fn. 30.)

experiment many times: A match by chance alone is more likely the larger the number of profiles examined."

The trial court ruled it would (1) exclude source attribution evidence, because the prosecutor represented that none of his witnesses were going to render such an opinion, (2) preclude as argumentative the question about "how many worlds," and (3) allow some cross-examination about previous mistakes by prosecution experts but would not allow hearsay, a DOJ memorandum by Steven Myers--whom no one intended to call as a witness--critical of the county's experts and lab practices. As to the fifth matter raised by defendant, the motion to exclude hearsay testimony regarding the DNA testing, the prosecutor said he intended to present the test results through the person who actually conducted the test rather than a supervisor, and the trial court granted that part of the motion in limine. As to the fourth matter regarding database searches, the trial court deferred ruling because defense counsel said he had become aware of case law that may be relevant. The trial court expressed its view that the court in *Nelson* held random match probability was an appropriate way to present the matter to the jury.

In its later ruling, the trial court noted that the court in *Nelson* held "the use of the product rule in a cold hit case was not an application of a new scientific technique subject to a further *Kelly* or *Kelly*-like test.[9] And the fact that [a] match ultimately came about by means of a database search, did not deprive the rarity statistic of all relevance under [E]vidence [C]ode section 210. [¶] It seems to me that what [the court in *Nelson*] says is yes, the random match probability is there and is the way to present the evidence. [¶] If you choose to cross-examine witness about another way to calculate the odds, it seems to me you can do that but, you know, I am not sure how that plays itself out. [¶] I understand the fact pattern to be that there is no person that you're calling that's a scientist in the relevant scientific community that's going to come in and say database

---

**9** *People v. Kelly* (1976) 17 Cal.3d 24.

searches need to be calculated in this particular fashion. [¶] But it seems to me that if there is a witness on the stand, then you can ask them relevant questions about if they think the database, the fact that it is in a database changes anything. [¶] So I wouldn't, from the Court's standpoint, preclude you from asking questions about what that means and asking whether they personally put any stock in the fact that it is out of a database as opposed to a random match. So it seems to me you're able to ask questions about it, argue about it.

"But, you know, we don't have any way of saying other than the law says the prosecutor can present it this way. I do not read the language in *Nelson* saying that's the only way it can be presented in theory or that you can't have other testimony about a database issue. I do recall seeing some language in the case about it is not the database that's on trial. [¶] But if the question is whether or not you can ask questions something along the line of having somebody if they are an expert say does it matter to you--if they testify about random match probability, does it matter to you whether this was a hit found in a database. [¶] Comments from either counsel. [Defense counsel] Mr. Nelson?

"[Defense counsel]: No, Your Honor, I'm satisfied with that."

The prosecutor objected such questions were unnecessary and would confuse the jury. The trial court disagreed.

Herbert testified at trial:

"A. . . .[If the evidence sample and the reference sample match] now you need to basically make that mean something, what does that mean when we say they are the same profile. So we apply statistics to it to tell you how rare or not rare that profile is.

"Q. And is there a formula that is used to calculate the rarity of that profile?

"A. Yes, there is.

"Q. What do we call the formula that was used here in this case?

"A. It is called the Random Match Probability.

"Q. Can you just describe for us in a thumbnail sketch of how the random match probability is calculated?

"A. It takes into account the frequency of all of the alleles at each marker and comes up with a number that basically says here's this profile, what is the probability that I could pick somebody at random and they would have this same exact profile."

Cross-examination of Herbert included the following:

"Q. . . . [I]f you had a random match probability of 1 in 2 trillion of the African American population and you learned that a person is identified through searching of a database of 1 million, would you agree that it is fair to say that a chance of a random match increases by a million times?

"A. Yes, that's called N [number in the database] times P [probability].

"Q. And it's fair to say that in scientific literature are you familiar with scientists who have described a fact that when you search a databank that increases the chance of finding a profile matching evidence by coincidence?

"A. I have seen articles on that, yes.

"Q. That's your understanding of what some . . . scientists have written about?

"A. Yes.

"Q. If you take a profile that has a random match probability of 1 in 2 trillion and search through a databank of 7 million, would you agree that the chance of a coincidental match increases 7 million times?

"A. Yes, assuming all those profiles are not related, yes.

Cross-examination of Johnson included the following:

Q. "Your description here was that this is--somehow explains the rarity of a profile but yet you're using terminology that incorporates probability. [¶] How does . . . probability and your use of the word "rarity," . . . fit together?

A. "The number that we get represents the probability that you would be able to go out into the population and select a person at random and that person's profile would

13

be the same as the profile in the evidence sample. That's what the random match probability number gives you."

Q. So it is a very specific sort of question; is that right?

A. Yes.

Q. And it does not ask the question what's the chance that somebody other than the defendant would match; is that fair to say.

A. That's fair to say. I would not explain it that way.

Q. And that would be an improper way to say it; is that right?

A. Yes.

In closing argument, the prosecutor told the jury: "You heard how once you get that hit from the database, you don't just rely on it and say, you know what, that's good enough for us. You have to go out and test it yourself. You want to verify the accuracy of the information that's being provided to you by the Department of Justice [DOJ]. [¶] And the way that you do that is to take a reference sample directly from the person, go to the source, go to the man, put the swab in his mouth, take his DNA so that we are confident that the DNA that we're looking at is his. And that's what [police] did in this case on August the 1st of 2007. [¶] In September of 2007, after we had got that reference profile back, Mr. Herbert did analysis on the defendant's profile. He developed his own work, independent of what [DOJ] was telling him . . . ." "[Defendant's] profile is an exact match to the rapist's profile." "[T]he number doesn't change. It is still 1 in 2 trillion because the number applies to the evidentiary sample."

Defense counsel argued to the jury: "What the lab has done, and I would argue to you improperly, is they have taken this probability theory and these fantastic numbers and tried to tell you this shows the rarity of the profile. I think that's a misstatement of what the random match probability predicts. It is an estimate. And it asks a very specific question, what's the chance that one randomly selected person from an unrelated population would share the same profile as the others. So it considers chance,

14

probability, and it talks about unrelated populations which Ms. Johnson was not sure how that fit into the analysis. [¶] And it is not, she agreed, the chance that someone other than the defendant matches the evidence. That would be, in fact, an improper use of this statistic because it does not ask a very particular. [*sic*] [¶] And whether you think that makes sense or not to you, that's the testimony here. And the point is that going into the jury room and talking about the significance of these numbers, it is important that the proper meaning of the statistic is looked at.

"Now CODIS. That's the databank that was searched. Mr. Herbert testified, he testified to this idea of N/P, which is a different sort of formula. But I asked if you take a database of 7 million people and you search a particular profile through that database, does that in fact increase the likelihood of a coincidental or false match by 7 million times. His simple answer was yes. . . . [¶] His statements and acknowledgement that searching a database increases the chance of finding the wrong person is uncontradicted by Deven Johnson. She wasn't asked by [prosecutor] Mr. Hill to comment on the issue.

"Now, the effect of a databank match. [The prosecutor] said we only got one name, that's good enough. Well, if we put a name into a databank or we put a profile into a databank, we get one name and that's the reason [defendant] is sitting here today. And what I would ask you to consider is that if you retest his profile, well it would be the same and probably still match again, so there is no point in that. [¶] But ask this. Let's say that next time you went to renew your driver's license, D.M.V. [required a DNA swab from everyone to enter into a databank and] every time we have an unsolved crime, we're going to run the profiles we get from those unsolved cases against everybody's profile. And that if your number comes up, boom, you're sitting over there . . . ."

Defense counsel reiterated to the jury the uncontested testimony of prosecution witness Jeffrey Herbert that the chances of finding the wrong person increase by seven million times when you search a database of seven million.

15

In rebuttal, the prosecutor said the sample that mattered (apparently referring to the reference sample rather than the database sample) applied random match probability, which is the widely-accepted test.

### B. Analysis

We conclude that the trial court did not err,[10] because random match probability is relevant and even assuming it had no relevance, any error was harmless.

### 1. Relevance of Random Match Probability Statistics

Defendant argues the trial court misread *Nelson* as permitting the use of random match probability in a cold-hit case, because *Nelson* purportedly held product rule statistics are not admissible for that purpose. The trial court did not misread *Nelson*; defendant does. The Fifth Appellate District recently addressed the argument defendant makes here in *People v. Xiong* (2013) 215 Cal.App.4th 1259 (*Xiong*) and concluded that the *Nelson* court held random match probability is relevant statistical match evidence and therefore admissible. We agree with the *Xiong* court's interpretation of *Nelson*.

"A match between a suspect's traits and the perpetrator's traits directly incriminates the suspect by demonstrating that he resembles the perpetrator and therefore *could be* the perpetrator. But the match alone does not establish the weight of the evidence. Anyone with the same profile could be the perpetrator, and if a large number of people share the profile, the match does not carry much evidentiary weight. Thus, the match requires a second piece of evidence--the statistical frequency of the profile. 'The statistical evidence gives the match evidence its weight. It is an expression of the rarity of the perpetrator's profile, the size of the pool of possible perpetrators, and the likelihood of a random match with the perpetrator's profile.' [Citation.] 'The

---

**10** Because we conclude the trial court did not err, we need not address the People's argument that defendant forfeited the claim by failing to adequately object to the evidence and defendant's response that any failure to object amounted to constitutionally ineffective assistance of counsel.

16

determination of what is often called the "significance of the match" is a statistical assessment of *how incriminating* it is that the defendant's profile matches the perpetrator's.' [Citation.] The rarer the profile in the population, the more likely the defendant is in fact the perpetrator. [Citations.]" (*Xiong*, *supra*, 215 Cal.App.4th at pp. 1269-1270, fn. omitted.)

"The genetic traits examined to create a DNA profile are regions or loci of highly variable and repetitive DNA. . . . Because a person inherits a set of chromosomes (22 plus an X or Y) from each parent, every genetic locus has two versions (alleles). For statistical analysis, the frequency with which each possible allele at each locus exists in various populations has been estimated through studies of population databases. From these tabulated frequencies, the frequency of a perpetrator's overall DNA profile can be estimated: the frequencies of the two alleles at every locus in a perpetrator's profile are all assigned, then multiplied together to obtain the frequency of the entire multilocus profile in the relevant population. This method is known as the 'product rule.' The resulting frequency (sometimes called the 'rarity statistic') can also be expressed as the probability that the profile of a person selected at random from the relevant population would match the perpetrator's profile. [Citation.] When, as in this case, the perpetrator's profile consists of 15 loci, the resulting statistics establish that the profile is astronomically rare and therefore that a suspect's possession of it is " 'powerfully incriminating.' " (*Xiong*, *supra*, 215 Cal.App.4th at p. 1270.)

Like defendant here, the defendant in *Xiong* asserted that *Nelson* held random match probability statistics were not relevant in cold hit cases. (*Xiong*, *supra*, 215 Cal.App.4th at p. 1270.) In analyzing *Nelson*, the *Xiong* court quoted the opinion at length. (*Xiong,* at pp. 1271-1272.) We do the same, quoting some of the same passages as did the *Xiong* court.

Phrasing the issue as whether evidence obtained by use of the product rule is relevant in a cold hit case, the *Nelson* court began with the definition of relevant

evidence. " 'Relevant evidence is evidence "having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (Evid. Code § 210.) " 'The test of relevance is whether the evidence tends, "logically, naturally, and by reasonable inference" to establish material facts such as identity, intent, or motive.' " ' [Citation.] *Under this test, the product rule generates relevant evidence even in a cold hit case.*" (*Nelson*, *supra*, 43 Cal.4th at p. 1266, italics added.)

The *Nelson* court then went on to discuss the product rule in cold hit cases. In doing so, it quoted some of the discussion in *United States v. Jenkins* (D.C. Ct.App. 2005) 887 A.2d 1013 (*Jenkins*). The *Nelson* court wrote, "It is certainly correct that, as one treatise that discussed this question put it, 'the picture is more complicated when the defendant has been located through a database search. . . .' [Citation.] The *Jenkins* court recognized this circumstance. It explained that in a non-cold-hit case, the number derived from the product rule 'represents two concepts: (1) the frequency with which a particular DNA profile would be expected to appear in a population of unrelated people, in other words, how rare is this DNA profile ("rarity statistic"), and (2) the probability of finding a match by randomly selecting one profile from a population of unrelated people, the so-called "random match probability." ' (*Jenkins*, at p. 1018.)

"The [*Jenkins*] court explained that *the government had conceded* 'that in a cold hit case, the product rule derived number no longer accurately represents the probability of finding a matching profile by chance.[11] The fact that many profiles have been searched increases the probability of finding a match.' (*Jenkins*, *supra*, 887 A.2d at

---

**11** The government in *Jenkins* had not sought to introduce evidence of random match probability. Rather, it sought to introduce evidence of the "rarity statistic." The district court rejected the evidence based on *Frye v. United States* (D.C. Ct.App. 1923) 293 F. 1013. (*Jenkins*, *supra*, 887 A.2d at pp. 1019, 1020-1021) The *Jenkins* court held that the rarity statistic had gained scientific acceptance and thus met the test of *Frye*. (*Jenkins*, at pp. 1019, 1022-1023, 1026.)

p. 1018, fn. omitted, italics added.)  The footnote in the middle of this quotation elaborated: 'In other words, the product rule number no longer accurately expresses the random match "probability."  That same product rule number, however, still accurately expresses the *rarity* of the DNA profile.  Random match probability and rarity, while *both identical numbers*, represent two distinct and separate concepts.  Only one of those concepts is affected by a database search: the random match probability.' (*Id*. at p. 1018, fn. 7.)  The [*Jenkins*] court noted that 'the "database match probability" [the approach suggested in the NRCII][12] more accurately represents the chance of finding a cold hit match' and 'can overcome the "ascertainment bias" of database searches. "Ascertainment bias" is a term used to describe the bias that exists when one searches for something rare in a set database.' (*Id*. at pp. 1018–1019.)

"Although the product rule no longer represents the random match probability in a cold hit case, the *Jenkins* court ultimately agreed with the government's argument 'that

---

**12**  Under the database match probability approach, "the expected frequency of the profile could be calculated through use of the product rule, and the result could then be multiplied by the number of profiles in the databank.  The result would be the expected frequency of the profile in a sample the size of the databank and thus the random chance of finding a match in a sample of that size.  The result may be significant when few loci are tested and the discriminatory power of the testing is limited, but the significance tends to disappear when many loci are tested." (*Nelson, supra*, 43 Cal.4th at p. 1262.)  As an example, the *Nelson* court wrote, "Assume the product rule calculated random match odds of one in 1,000,000.  If a single suspect were compared and a match found, the result would be surprising unless the suspect were the actual donor of the evidence.  But if a database of 100,000 were searched, the odds--or database match probability--would be about one in 10 that a match would be found even if the actual donor were not in the database.  Thus, a match would be less surprising.  If the database had a million profiles, at least one match would be expected even if the actual donor was not in the databank." (*Ibid*.)  In addition to random match probability and database match probability, the *Nelson* court discussed two other methods to calculate the statistical significance of a match in a cold hit case. (*Nelson*, *supra*, at pp. 1261-1262.)  It was apparently these various methods the trial court referenced when it ruled that defense counsel could "cross-examine witness about another way to calculate the odds, it seems to me you can do that but, you know, I am not sure how that plays itself out."

19

regardless of the database search, the rarity statistic is still accurately calculated and appropriately considered in assessing the significance of a cold hit. . . . [W]hile a database search changes the probability of obtaining a match, it does not change how rare the existence of that specific profile is in society as a whole. . . . This rarity is . . . both consistent and relevant regardless of the fact that [the defendant's] identification is the product of a database search.' (*Jenkins*, *supra*, 887 A.2d at p. 1019.)'' (*Nelson*, *supra*, 43 Cal.4th at pp. 1266-1267, italics added; see also *Xiong*, *supra*, 215 Cal.App.4th at p. 1272.)

The *Nelson* court then explained, "In a non-cold-hit case, . . . '[it is relevant for the jury to know that most persons of at least major portions of the general population could not have left the evidence samples.' [Citation.] We agree with other courts that have considered the question [citations] that this remains true even when the suspect is first located through a database search. The database match probability ascertains the probability of a match from a given database. 'But the database is not on trial. Only the defendant is.' [Citation.] Thus, the question of how probable it is that the *defendant*, not the database, is the source of the crime scene DNA remains relevant. [Citation.] The rarity statistic addresses this question. [¶] . . . It remains relevant for the jury to learn how rare this particular DNA profile is within the relevant populations and hence how likely it is that someone other than defendant was the source of the crime scene evidence." (*Nelson*, *supra*, 43 Cal.4th at pp. 1266–1267; see also *Xiong*, *supra*, 215 Cal.App.4th at pp. 1271-1272.)

While conceding that the *Nelson* court's language suggested statistics generated by the product rule are relevant in cold hit cases only when stated as a profile frequency--which the *Jenkins* and *Nelson* courts referred to as a "rarity statistic"--the *Xiong* court concluded that the holding in *Nelson* is more broad. (*Xiong*, *supra*, 215 Cal.App.4th at pp. 1272-1273.) The *Nelson* court actually held that both the frequency (rarity statistic) and the random match probability are relevant in cold hit cases. (*Xiong,* at p. 1273.)

20

The *Xiong* court observed that, despite what it called a "confusing use" of the term "rarity statistic,"[13] the court in *Nelson* repeatedly spoke in broad terms of the relevance and admissibility of statistics calculated by the *product rule*, which would include both frequencies and random match probabilities. (*Xiong, supra,* 215 Cal.App.4th at p. 1273.) Also, the *Nelson* court's use of the terms "frequency" and "random match probability" indicates that the court was not drawing a distinction between the two. (*Xiong,* at p. 1273.) And the *Xiong* court looked to a legal treatise published long after *Nelson* in which Justice Ming Chin, the author of *Nelson*, wrote "The rarity of the DNA profile shared by the perpetrator and defendant, *expressed by the random match probability statistic*, is always relevant and admissible, even in cold hit cases where the defendant was originally identified in a database search. . . . (Chin et al., Forensic DNA Evidence: Science and the Law (The Rutter Group 2012) Statistics for Autosomal STR Profiles, § 5:4, p. 5–9.)" (*Xiong,* at pp. 1273-1274.)

The *Xiong* court concluded, consistent with its reading of *Nelson*, that both the frequency (rarity statistic) and random match probability are relevant in cold hit cases. (*Xiong*, *supra*, 215 Cal.App.4th at p. 1274.) "They are, after all, two ways of representing the same thing, the same numbers couched in different concepts." (*Ibid*.) The frequency (rarity) statistic "assesses how few people possess the perpetrator's profile, and the random match probability assesses how unlikely it is that a random person possesses the perpetrator's profile. They have nothing to do with a particular defendant or suspect, or the manner in which he was found, and they can be calculated before any suspect is located. They are fixed and unchanging. When a suspect is located by whatever means, the frequency and probability of the perpetrator's profile remain the same. They give the

---

[13] The *Xiong* court explained, "We now take *Nelson's* use of 'rarity statistic' to refer to both the frequency and the random match probability, rather than just the frequency." (*Xiong*, *supra*, 215 Cal.App.4th at p. 1274.) We agree.

21

jury perspective on how few people are likely to have this profile and how incriminating it is that the defendant has it--regardless of how he was found.  [¶]  Furthermore, both statistics refer to the rarity of the profile in the *relevant population(s)*.  In general, an offender database is not the relevant population.  Thus, we think the chance of finding a match *in a database* generally does not matter.  And we think *Nelson* agrees." (*Ibid.*)

Like the defendant in *Xiong* and others, defendant here contends that in cold hit cases, the random match probability is not relevant because the match to the particular defendant made by searching an offender database is not random.  We agree with the *Xiong* court when it observed that this argument, "misses the point.  The point is the rarity of, or the chance of finding, the *perpetrator's* profile in the *perpetrator's* population(s). The chance of finding a particular defendant in an artificially created 'population' of criminals and arrestees is not germane. . . . [¶] . . . [W]hen a particular defendant is found by searching an offender database, that database of criminals and arrestees does not necessarily become the relevant population for gauging the rarity of the profile in a meaningful way.  The relevant populations(s) are generally the major populations in the United States because they provide a jury with the most useful estimates, regardless of the fact that the particular defendant was found as a match by looking through a different population." (*Xiong*, *supra*, 215 Cal.App.4th at pp. 1274-1275.)  "[T]he fact that here, the genetic profile from the evidence sample (the perpetrator's profile) matched the profile of someone in a database of criminal offenders, does not affect the strength of the evidence against [the defendant].  The strength of the evidence against him (at least in terms of the DNA evidence) depends upon the confirmatory match between *his* profile and that of the perpetrator, and the calculation of the frequency of the *perpetrator's* profile in the relevant population.  That population is the population of possible perpetrators, not the population of convicted offenders whose DNA has been entered into CODIS." (*Id.* at p. 1276.)

22

To the *Xiong* court's analysis, we can only add the following. We are confident that if our high court was of the mind that the random match probability is irrelevant in cold hit cases, it would have said so in express terms in *Nelson*. It would have been a simple matter to say random match probability statistics are irrelevant in cold hit cases and should be excluded, but our high court articulated no such prohibition.

For all of these reasons, we reject defendant's reading of *Nelson*. Random match probability is relevant in cold hit cases. The trial court did not err in allowing the evidence.

## 2. Harmless Error

Even if we and the *Xiong* court are wrong about our interpretation of *Nelson* and the admissibility of random match probability, the purported error here is nevertheless harmless.

Error in the admission of evidence is not reversible absent a miscarriage of justice. (Evid. Code, § 353; *People v. Richardson* (2008) 43 Cal.4th 959, 1001.) Although evidentiary error under state law is generally subject to review under the *Watson* standard of reasonable probability of a more favorable verdict (*People v. Watson* (1956) 46 Cal.2d 818, 836), defendant attempts to raise the stakes by arguing there was a misleading presentation of DNA evidence in violation of federal due process, triggering the prejudice standard of *Chapman v. California* (1967) 386 U.S. 18 [17 L.Ed.2d 705] (*Chapman*), requiring the prosecution to prove the error was harmless beyond a reasonable doubt. Assuming for the sake of argument that defendant preserved a due process claim, and further assuming for the sake of argument that the *Chapman* standard applies, we conclude the use of random match probability was harmless beyond a reasonable doubt.

Had the trial court precluded random match probability, the very same numbers would have been admissible as "rarity statistics." And these numbers provide overwhelming evidence of guilt. "Rarity statistics," referenced by the *Xiong* court by the less confusing synonym, "frequency statistics," describe the frequency with which a

23

DNA profile would be expected to appear in a population of unrelated people or, stated differently, how rare is this DNA profile. (*Nelson*, *supra*, 43 Cal.4th at p. 1266, citing *Jenkins*, *supra*, 887 A.2d at p. 1018.) The *Jenkins* court stated, "The likelihood that the suspect is the actual source of the DNA is best expressed through the rarity of a particular profile. Thus, the rarity statistic is highly probative and will always be relevant." (*Jenkins*, *supra,* 887 A.2d at p. 1025.) The rarity or frequency statistic is the same number as the random match probability statistic. (*Xiong*, *supra*, 215 Cal.App.4th at p. 1274; *Jenkins*, *supra,* 887 A.2d at p. 1025.)

Herbert testified that looking at 13 loci of the profile from the sperm fraction of the vaginal swab he tested, that profile was estimated to occur at random among unrelated individuals in approximately one in two trillion African Americans, one in 48 trillion Caucasians, and one in 60 trillion Hispanics. Stated as a rarity statistic, the rarity of the 13 loci in defendant's profile that Herbert looked at is approximately one in two trillion African Americans, one in 48 trillion Caucasians, and one in 60 trillion Hispanics.

Johnson, looking at 15 loci, testified that defendant's reference sample and the sperm fraction she developed from the vaginal swab she tested and the car seat cuttings, would occur at random among unrelated individuals in approximately one in 900 trillion of the African-American population,[14] one in seven quadrillion of the Caucasian population, and one in 16 quadrillion of the Hispanic population. Stated as a rarity statistic, the rarity of defendant's 15 loci profile is approximately one in 900 trillion of the African-American population, one in seven quadrillion of the Caucasian population, and one in 16 quadrillion of the Hispanic population.

As can be readily seen, expressing these astronomical numbers in terms of how rare the DNA profile associated with defendant is in the relevant populations does not

---

[14] Numerically, 900 trillion is expressed, 900,000,000,000,000. (Merriam-Webster's Collegiate Dict. (11th ed. 2006) p. 852 [one trillion is one followed by 12 zeros].)

24

help defendant. We are confident that the verdict would have been the same had the jury heard these numbers as "rarity" or "frequency" statistics rather than random match probability.

We conclude that any error in admitting the statistical evidence as a random match probability statistic was harmless.

## II.  Impeachment Evidence

Defendant argues the trial court improperly restricted his attempt to impeach the prosecution's DNA experts with a DOJ evaluation prepared in an unrelated case, *People v. Smith*, *supra*, C062513. The evaluation criticized the county crime lab for a systemic lack of understanding about DNA statistical theory related to mixed samples and criticized Herbert's performance in the *Smith* case. We see no grounds for reversal.

## A.  Background

Defendant sought to introduce into evidence an eight-page August 2009 report by Steven Myers of the DOJ, evaluating Herbert's performance as grossly overstating the weight of evidence in the *Smith* case, which involved the rarity of an inclusion as a possible contributor to a mixture. Myers opined that the mistake was the result of a lack of understanding by Herbert and the county crime laboratory's policies and practices, concerning application of statistics to mixed samples. As indicated (fn. 2, *ante*), we grant defendant's request for judicial notice of Myers's report.

The prosecution sought to preclude the defense from questioning Johnson about deficiencies in Herbert's performance and to preclude questions about lab policy regarding "combined probability of inclusion" (CPI), which relates to mixed samples. The prosecution in the instant case told the court during the in limine hearings that although a vaginal swab from the victim was promptly tested in 2001, the evidence *taken from the car* was not processed until 2009, because Herbert placed the car seat cuttings in the crime lab freezer without writing a report and following the lab procedures for booking evidence. When it was discovered in 2009, a different criminalist (*Johnson*)

25

analyzed that evidence for DNA, and the DNA profile is consistent with defendant's profile. The prosecutor also represented to the court that the criticism in the unrelated *Smith* case concerned a test not at issue in this case (CPI).

The trial court said it would sustain hearsay objections to use of the DOJ memorandum, but the defense could cross-examine Herbert about the *Smith* case to the extent mixed samples were involved in both cases.

As indicated, Herbert acknowledged during his trial testimony that he no longer does DNA analysis due to his violating protocol by failing to book evidence properly in this case. Herbert also testified that he did a second test in the *Smith* case that yielded results more favorable to Mr. Smith and did not tell anyone about it because it was not part of the crime lab's protocol. When asked if his testimony in the *Smith* case grossly overstated the statistics, Herbert said he followed and testified to the procedures the laboratory had in place at the time. On redirect, Herbert testified the *Smith* case involved CPI, which was not at issue in this case. Johnson testified the crime lab previously used an incorrect method for mixed samples but now uses a better method.

## B. Analysis

Defendant claims reversal is warranted because the trial court violated his constitutional right to present a complete defense by precluding impeachment of prosecution witnesses with the Myers memorandum. We disagree.

An adverse party should be given "wide latitude in the cross-examination of experts in order to test their credibility," and "a broader range of evidence may be properly used on cross-examination" than on direct examination. (*People v. Coleman* (1985) 38 Cal.3d 69, 92.) Peer criticism may be relevant. (*Scripps Memorial Hospital v. Superior Court* (1995) 37 Cal.App.4th 1720, 1731, fn. 16.) Criticisms about the quality of DNA testing are appropriate topics for cross-examination. (*People v. Reeves* (2001) 91 Cal.App.4th 14, 46.)

26

However, not every restriction on a defendant's desired method of cross-examination is a constitutional violation. (*People v. Frye* (1998) 18 Cal.4th 894, 946, disapproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22.) Within the confines of the Confrontation Clause and California law, the trial court retains wide latitude in restricting cross-examination that is prejudicial, confusing, or of marginal relevance. (*People v. Virgil* (2011) 51 Cal.4th 1210, 1251; *People v. Woodberry* (1970) 10 Cal.App.3d 695, 709.)

Defendant cites authority that an adverse party may challenge an expert by inquiring about relevant evidence, *including hearsay*, which he may have overlooked or ignored. (*People v. Gutierrez* (2002) 28 Cal.4th 1083, 1158; *People v. Montiel* (1993) 5 Cal.4th 877, 924.) Here, however, the hearsay evidence was not about matters the expert overlooked or ignored. Rather, it was hearsay criticism of the experts on an unrelated issue in an unrelated case.

The trial court allowed defendant to confront the prosecution experts about defects in the handling of this and prior cases. Defendant argues the cross-examination he was allowed to conduct was ineffective without reference to the actual content of the Myers memorandum. The Myers memorandum would show the crime lab scientists lacked understanding of DNA statistical theory, and an understanding of science is what makes an expert an expert, defendant contends. Without the memorandum, says defendant, the witnesses were able to dissemble. Herbert refused to concede insufficient understanding of statistical theory and said he was only following the procedures he had been taught, and it was the only tool they had at the time. Defendant says Johnson left the jury with the impression that her mistakes were not due to the "systemic problem" that Myers found, but were a brief "glitch" limited to a few months in 2009.

However, defendant's point about Herbert--that Herbert falsely blamed the system rather than himself--is undermined by defendant's repeated claims of "systemic" problems at the laboratory. The systemic problems referenced in the Myers memo

27

related to the analysis of mixed samples,[15] and this case involves single source samples. Moreover, the jury heard evidence that the lab practices related to mixed samples have changed as a result of issues with the prior practices. Nothing in the Myers memorandum (which we have reviewed) criticized the performance or results of the DNA tests that took place in this case. And defendant presented no evidence of flaws in the DNA tests at issue here. Rather, defendant hoped to persuade the jury that once wrong about a DNA issue, always wrong about other DNA issues.

Assuming for the sake of argument that the trial court should have allowed the defense to use the Myers memorandum, there was no prejudice warranting reversal. (Evid. Code, § 354 [erroneous exclusion of evidence does not warrant reversal unless it caused a miscarriage of justice ]; *People v. Richardson, supra*, 43 Cal.4th at p. 1001.) Defendant invokes the *Chapman* prejudice standard for federal constitutional error. Even assuming for the sake of argument that the *Chapman* standard applies, any error in excluding the Myers memorandum was harmless beyond a reasonable doubt. The jury heard the substance of the criticism; to have it in writing from the DOJ would not have changed anything. Herbert's testimony in the *Smith* case was based on laboratory protocol which had since changed and which was not used in defendant's case.

Under the heading challenging restriction on impeachment, defendant appears to slip in a different argument, that the prosecution--by adducing evidence that supervisor Mary Hanson reviewed the work of Herbert and Johnson--relied on a non-testifying expert in violation of his right to confront experts under *Melendez-Diaz v. Massachusetts*

---

[15] Myers wrote in summary, "it is clear that a . . . lack of understanding was at the core of the laboratory's *mixture statistics* reporting policy and practices. Therefore this may be systemic problem." (Italics added.) He also said that, in addition to the revisions the lab was making to the mixture interpretation and statistical calculation sections of its DNA Manual, there was a need for "additional remedial training on the *mixture interpretation*, statistical, and population genetics issues involved." (Italics added.)

(2009) 557 U.S. 305 [174 L.Ed.2d 314].  However, to the extent defendant complains Hanson was not called as a witness, he did not object on that ground at trial (which postdated the *Melendez-Diaz* decision) at the time the evidence came in (despite having prevailed in his motion in limine to exclude hearsay of nontestifying experts), and he has therefore forfeited the matter.  (*Id.* 557 U.S. at pp. 326-327; *People v. Williams* (2008) 43 Cal.4th 584, 620; *People v. Burgener* (2003) 29 Cal.4th 833, 869.)

We conclude the trial court's exclusion of the Myers memorandum does not provide grounds for reversal.

### III.  Evidence Concerning Possession of a Semi-automatic Handgun

Defendant argues the trial court improperly allowed evidence that he possessed a different gun--a semiautomatic as opposed to a revolver--when police stopped his car in May 2002, to show he was a person who had "access" to guns.  Defendant argues access was irrelevant because the Second Amendment gives almost everyone access to guns, and the evidence was used as "propensity" evidence in violation of due process, triggering review under *Chapman*.  (*People v. Riser* (1956) 47 Cal.2d 566, 577 [evidence of defendant's possession of different gun on different occasion is inadmissible to show he is the sort of person who carries a gun], overruled on other grounds as stated in *People v. Mills* (2010) 48 Cal.4th 158, 197.)

We need not dissect this contention because, even assuming the evidence should have been excluded, and further assuming that the *Chapman* standard applies (points disputed by the People), any error was harmless beyond a reasonable doubt, individually or cumulatively with the other errors asserted by defendant.  The properly-admitted DNA evidence constituted overwhelming evidence of defendant's guilt.

Insofar as defendant thinks the evidence was used by the prosecutor to show propensity, the point is forfeited for failure to object during the testimony or closing argument, because the trial court in its ruling in limine expressly stated the evidence could not be used as character evidence.  Events at trial may change the context in which

evidence is offered to an extent that a renewed objection is necessary. (*People v. Morris* (1991) 53 Cal.3d 152, 190, disapproved on other grounds in *People v. Stansbury* (1995) 9 Cal.4th 824.) And a defendant forfeits a claim of prosecutorial misconduct in closing argument by failing to object during the closing argument. (*People v. Gray* (2005) 37 Cal.4th 168, 215.)

### IV.  Flight Instruction

Defendant complains the jury instruction on flight was unsupported by the evidence and contained an irrational permissive inference in violation of due process. We disagree.

Pursuant to section 1127c, the trial court instructed the jury: "If the defendant fled immediately after the crime was committed that conduct may show that he was aware of his guilt. If you conclude that the defendant fled, it is up to you to decide the meaning and importance of that conduct. However, evidence that the defendant fled cannot prove guilt by itself."

The prosecutor argued to the jury that "the person with something to hide was [defendant]. When he fled that scene that night, he hid. And he thought he got away with it for a long time."

" '[A] flight instruction "is proper where the evidence shows that the defendant departed the crime scene under circumstances suggesting that his movement was motivated by a consciousness of guilt." ' [Citations.] Evidence that a defendant left the scene is not alone sufficient; instead, the circumstances of departure must suggest 'a purpose to avoid being observed or arrested.' [Citations.] To obtain the instruction, the prosecution need not prove the defendant in fact fled, i.e., departed the scene to avoid arrest, only that a jury *could* find the defendant fled and permissibly infer a consciousness of guilt from the evidence. [Citation.]" (*People v. Bonilla* (2007) 41 Cal.4th 313, 328.) While it is true, "*[m]ere* return to familiar environs from the scene of an alleged crime does not warrant an inference of consciousness of guilt [citations], . . . the *circumstances*

of departure from the crime scene may sometimes do so." (*People v. Turner* (1990) 50 Cal.3d 668, 695.)

Defendant argues there was no evidence the perpetrator fled from the scene. However, there was evidence that he departed the scene under circumstances suggesting a consciousness of guilt. He told the victim to count to 1,000, which supports an inference he wanted a head start to get away before she did anything. And he took her driver's license containing her address and told her he would find her if she called the police. He also took the victim's sweatshirt--the garment he had used to clean the seat after having "freaked-out" apparently over ejaculating onto the seat. We reject defendant's argument that these actions cannot be considered "flight" simply because they occurred before he left the scene. These actions show a consciousness of guilt that the sex was not consensual.[16] Although the prosecutor did not argue these points to the jury, the evidence supported the instruction.

Defendant claims the prosecutor's argument to the jurors--that defendant "hid"-- invited them to speculate that he hid by living in motels, because his companion during the 2002 traffic stop said they had been living in motels. The point is forfeited for failure to object during the argument to the jury. (*People v. Gray, supra*, 37 Cal.4th at p. 215.)

Defendant argues the flight instruction allows an unconstitutional inference of guilt because it cannot be said with " 'substantial assurance' " that the inferred fact is " 'more likely than not to flow from the proved fact on which it is made to depend.' " (*Ulster County Court v. Allen* (1979) 442 U.S. 140, 166, fn. 28 [60 L.Ed.2d 777, 797].)

---

**16** Indeed, the court would have been justified in also giving an instruction on suppression of evidence. CALCRIM No. 371 reads in pertinent part, "If the defendant tried to hide evidence . . ., that conduct may show that (he/she) was aware of (his/her) guilt. If you conclude that the defendant made such an attempt, it is up to you to decide its meaning and importance. However, evidence of such an attempt cannot prove guilt by itself." Wiping up his ejaculate and taking the item he used for that purpose certainly qualifies as suppression of evidence.

31

The same argument was rejected in *People v. Mendoza* (2000) 24 Cal.4th 130, which, citing *Ulster*, concluded "[a] permissive inference violates the Due Process Clause only if the suggested conclusion is not one that reason and common sense justify in light of the proven facts before the jury.  [Citations.]  This test permits a jury to infer, if it so chooses, that the flight of a defendant immediately after the commission of a crime indicates a consciousness of guilt." (*Id.* at p. 180.) The instruction does not impermissibly direct the jury to make only one inference.  (*Id.* at pp. 180-181.) Here, the flight instruction given to the jury "adequately conveyed the concept that if flight was found, the jury was permitted to consider alternative explanations for that flight other than defendant's consciousness of guilt." (*People v. Bradford* (1997) 14 Cal.4th 1005, 1055.)

The flight instruction affords no basis for reversal.

## V.  Robbery Statute Of Limitations

Defendant contends the second degree robbery in Count Four is facially time-barred by the three-year statute of limitations.  (§§ 801, 213; *People v. Turner* (2005) 134 Cal.App.4th 1591, 1595 [robbery is subject to three-year limitations period].)  His failure to raise this point in the trial court does not forfeit the matter.  (*People v. Williams* (1999) 21 Cal.4th 335, 341 (*Williams*).)

The People request remand for the trial court to consider whether the limitations period was tolled or waived.  The People concede they "ha[ve] not found a basis for tolling nor an express waiver" but argue the record "may be incomplete."  We decline the People's suggestion and reverse the judgment on this count.

A prosecution commences upon filing of an indictment, information, or complaint; or upon arraignment of the defendant; or upon issuance of an arrest warrant describing the defendant with the same degree of particularity required for a complaint, indictment or information.  (§ 804.)  Absent tolling or waiver, the prosecution had to be commenced by July 2004, three years after the July 2001 commission of the offenses.  (§ 801

32

["prosecution . . . shall be commenced within three years after commission of the offense"].)

The robbery and other offenses in this case were committed on or about July 22, 2001. Defendant was arrested during the traffic stop on May 2, 2002. He was imprisoned in state prison on September 16, 2003, and sentenced to a term of 36 years 4 months, and on November 4, 2005, he was resentenced to a term of 29 years. He remained in custody ever since. The record contains a declaration in support of arrest warrant dated July 25, 2007. A complaint was filed in this case July 30, 2007.

"[W]hen the charging document indicates on its face that the action is time-barred, a person convicted of a charged offense may raise the statute of limitations at any time. *If the court cannot determine from the available record whether the action is barred*, it should hold a hearing or, if it is an appellate court, it should remand for a hearing." (*Williams, supra,* 21 Cal.4th at p. 341, italics added.) Here, we can determine from the available record that the robbery is time barred.

The People suggest there may be evidence of tolling not reflected in the record. A limitations period will not be tolled for any reason except those set forth in section 803. (§ 803, subd. (a).) Section 803, subdivisions (c) and (e) provide that the limitations period does not commence for certain crimes until the offense has been discovered. Clearly, the late discovery tolling provisions do not apply here.

Section 803, subdivision (d) provides a tolling period if the defendant "is out of the state when or after the offense is committed." While the record does not establish conclusively that defendant was in custody immediately after the May 2, 2002 arrest, the record shows that he became a state prisoner on September 16, 2003. It is clear defendant was not out of state after that day. Thus, even assuming he fled the state immediately after the crimes against the victim here and remained out of state every day (except May 2, 2002) up to his state prison incarceration so that the statute of limitations was tolled during that entire time period, the statute would have begun to run again on

33

September 16, 2003. Consequently, the three-year statute of limitations expired on September 16, 2006 at the latest, long before the July 25, 2007 arrest warrant issued.

We note that the prosecution could have been commenced with the filing of a John Doe arrest warrant, identifying the perpetrator by his DNA profile. (*People v. Robinson* (2010) 47 Cal.4th 1104, 1137.) The record discloses only one arrest warrant was filed in this case. The People do not suggest a John Doe warrant was filed in 2001 or anytime thereafter, and had there been a John Doe warrant filed, it would have been a fairly simple matter for the People to find that in the court's records and ask that the record on appeal be augmented to include it. The failure to do so suggests the non-existence of or inability to prove the existence of a John Doe warrant.

The People also suggest there may have been a waiver of the statute of limitations by defendant in the trial court that is somehow not reflected in the record before us. Our high court has recognized that a defendant can expressly waive the statute of limitations when to do so would be to the defendant's benefit. In *Cowan v. Superior Court* (1996) 14 Cal.4th 367, the defendant sought to plead guilty to a time-barred lesser offense pursuant to a plea bargain to avoid a capital charge. Our high court held that a defendant may expressly waive the statute of limitations to take advantage of the plea bargain. (*Id.* at p. 370.) The People offer no explanation why defendant here would have expressly waived the statute of limitations and we can see no benefit for him having done so.

In requesting that we remand this matter back to the trial court for a hearing on whether there has been a tolling or waiver, the People rely on *Williams*, citing the following quotation: "The silent record is partly the defendant's fault for not raising the issue at trial. It was, however, the prosecution's fault in the first instance for filing an information that, on its face, was untimely. In that situation, the fairest solution is to remand the matter to determine whether the action is, in fact, timely." (*Williams*, *supra*, 21 Cal.4th at p. 345.) The quote is taken out of context and the context illustrates the distinction between *Williams* and this case.

34

In *Williams*, the defendant had been convicted of perjury. When the defendant raised the statute of limitations on appeal, the People asserted that the prosecution was timely because an arrest warrant had, in fact, issued within the statutory time limit. The People also contended that delayed discovery tolled the statute of limitations. (*Williams, supra,* 21 Cal.4th at pp. 338, 339.) These assertions were acknowledged by our high court in the sentence immediately preceding the quote the People have cited to us. The full quotation reads, "*Here, the district attorney could easily have alleged in the information either that an arrest warrant issued before the time period had expired, or that the action was filed timely after discovery of the crime, or both (assuming either allegation is factually supported).* The silent record is partly the defendant's fault for not raising the issue at trial. It was, however, the prosecution's fault in the first instance for filing an information that, on its face, was untimely. In that situation, the fairest solution is to remand the matter to determine whether the action is, in fact, timely." (*Id*. at p. 345.) Unlike in *Williams*, the People here have not asserted grounds to avoid the statute of limitations. Indeed, they acknowledge they have no grounds. And we decline to order the trial court to expend its resources to go on a wild goose chase for tolling that does not exist or a waiver that would not have been in defendant's best interest to make.

We conclude that Count Four, second degree robbery, is time barred. Accordingly, we reverse the judgment of conviction on that count. The 15-year sentence, and the $20 and $30 fines imposed pursuant to Penal Code section 1465.8 and Government Code section 70373 must be vacated.

## VI. Section 667.8 Enhancements

Defendant argues the trial court erred in imposing two unstayed nine-year enhancements under section 667.8, kidnapping to commit a sex offense, on Counts Two and Three, forcible oral copulation and rape, in addition to imposing a "one strike" sentence of 25 years to life on Count One, forcible oral copulation, under section 667.61. Section 667.61, called the "one-strike law," makes a defendant eligible for a life sentence

35

if he commits a specified sex offense under specified circumstances including kidnapping with movement increasing risk of harm (§ 667.61, subd. (d)(2)).

Defendant makes three arguments: (1) The two enhancements for "kidnapping to commit a sex offense" (see § 667.8) must be *stricken* because the People failed to tender adequate instructions and verdict forms, and the jury did not make the findings specific for the enhancements; (2) The two section 667.8 enhancements must be *stayed* because the kidnapping circumstance was "fully consumed" by the one-strike sentence (see § 667.61, subd. (f)) imposed on Count One, and dual use is prohibited by both section 667.61 and section 654; (3) At a minimum, one of the two section 667.8 enhancements must be stayed because section 667.8 allows only one enhancement per incident.

We conclude both section 667.8 enhancements must be stayed pursuant to section 667.61, but not stricken.

### A. Overview Of Statutes

Section 667.8[17] provides for a nine-year enhancement for a person convicted of specified sex offenses, including forcible oral copulation and rape, where the defendant kidnapped the victim under section 207, simple kidnapping,[18] for the purpose of committing the sex offense.

---

[17] Section 667.8 provided (and continues to provide) in pertinent part: "(a) . . . any person convicted of a felony violation of [sex offenses including rape and oral copulation] who, for the purpose of committing that sexual offense, kidnapped the victim in violation of Section 207 . . . , shall be punished by an additional term of nine years. [¶] . . . [(c)](1) Only one enhancement shall be imposed for a victim per incident. . . . [¶] (3) The enhancement may be in addition to the punishment for either, but not both, of the following: [¶] (A) A violation of Section 207 or 209. [¶] (B) A violation of the sexual offenses enumerated in this section." (Stats. 1997, ch. 817, § 9.)

[18] Section 207, subdivision (a) provided (and continues to provide) in pertinent part: "Every person who forcibly, or by any other means of instilling fear, steals or takes, or holds, detains, or arrests any person in this state, and carries the person into another country, state, or county, or into another part of the same county, is guilty of kidnapping."

36

Section 667.61,[19] authorizes a life sentence for specified sex offenses under specified circumstances including (1) kidnapping with movement substantially increasing the risk of harm to the victim (§ 667.61, subd. (a) & (d)(2)), and (2) a section 207 kidnapping, "except" increased-harm kidnapping, together with a second additional circumstance such as firearm use (§ 667.61, subd. (e)(1) & (e)(4)). Any additional circumstances, pleaded and proven, beyond the minimum necessary for the one-strike

---

[19] Section 667.61 at the time in question provided in pertinent part: "(a) A person who is convicted of an offense specified in subdivision (c) [including rape and forcible oral copulation] under one or more of the circumstances specified in subdivision (d) [including kidnapping with movement substantially increasing risk of harm to victim] or under two or more of the circumstances specified in subdivision (e) [including kidnapping under section 207 '[e]xcept as provided in . . . subdivision (d)'[kidnapping with movement substantially increasing the risk of harm] plus personal use of a firearm] shall be punished by imprisonment in the state prison for [25 years to life]. . . [¶] . . . [¶]

"(f) If only the minimum number of circumstances specified in subdivision (d) or (e) which are required for the punishment provided in subdivision (a) . . . to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis for imposing the term provided in subdivision (a) . . . rather than being used to impose the punishment authorized under any other law, unless another law provides for a greater penalty. However, if any additional circumstance or circumstances specified in subdivision (d) or (e) have been pled and proved, the minimum number of circumstances shall be used as the basis for imposing the term provided in subdivision (a), and any other additional circumstance or circumstances shall be used to impose any punishment or enhancement authorized under any other law. Notwithstanding any other law, the court shall not strike any of the circumstances specified in subdivision (d) or (e).

"(g) The term specified in subdivision (a) . . . shall be imposed on the defendant once for any offense or offenses committed against a single victim during a single occasion. . . . Terms for other offenses committed during a single occasion shall be imposed as authorized under any other law, including Section 667.6 [consecutive sentencing], if applicable. [¶] . . . [¶]

"(i) For the penalties provided in this section to apply, the existence of any fact required under subdivision (d) or (e) shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact. . . ." (Stats. 1998, ch. 936, § 9.)

sentence may be used to impose any enhancement authorized under any other law. (§ 667.61, subd. (f).)

## B. Procedural Background

In addition to charging section 209, subdivision (b)(1), kidnapping to commit a sex crime, in Count Five, the information alleged three kidnapping enhancements for each of the three sex counts:

(1) Kidnapping for the purpose of committing a sex offense (§§ 207 [simple kidnapping], 667.8, subd. (a) [nine-year enhancement for kidnapping to commit sex offense]);

(2) Kidnapping under section 207 with movement substantially increasing the risk of harm to the victim (§ 667.61, subds. (a) & (d)(2)); and

(3) Kidnapping under section 207 (simple kidnapping) "in violation of 667.61(a) and (e)(1)" with personal use of a firearm providing the requisite second circumstance under former section 667.61, subdivision (e)(4).

The jury instruction for Count Five, the substantive crime of kidnapping to commit a sex offense, told the jury that defendant was charged "with kidnapping for the purpose of rape *or* oral copulation," and the People must prove that defendant had the intent to commit rape *or* oral copulation when his movement of the victim began, and the movement must have been far enough to substantially increase the risk to the victim beyond that necessarily present in the rape *or* oral copulation. (Italics added.)[20]

---

[20] The instruction for Count Five read in pertinent part as follows: "[¶] The defendant is charged in Count 5 with kidnapping for the purpose of rape or oral copulation in violation of Penal Code section 209(b). [¶] To prove that the defendant is guilty of this crime, the People must prove that: [¶] 1. The defendant intended to commit rape *or* oral copulation; [¶] 2. Acting with that intent, the defendant took, held, or detained another person by using force or by instilling reasonable fear; [¶] 3. Using that force or fear, the defendant moved the other person or made the other person move a substantial distance; [¶] 4. The other person was moved or made to move a distance beyond that merely incidental to the commission of a rape *or* oral copulation; [¶] 5. When that movement began, the

38

The jury instructions for the one-strike enhancement allegations told the jurors to decide whether the People proved (1) that defendant kidnapped the victim with movement substantially increasing the risk of harm to her, and (2) that defendant kidnapped the victim.[21]  The court did not provide the jury with instructions specific to the section 667.8, subdivision (a) enhancement allegations attached to Counts Two and Three, kidnapping to commit a sex offense.

The prosecutor argued to the jury that, for Count Five, defendant kidnapped the victim with intent to commit the sex offenses.  He argued defendant said to the victim, " 'You will give me money or you will please me.'  We knew what was going on in his head, sex and money.  That was what he was after.  There is no reason to drive a person to a darkened location if all you're going [to] do is rob them, you do that right there in the open.  We know he was intending to sexually assault her."

The prosecutor told the jurors they would then have to decide the kidnapping enhancement allegations appended to the sex counts.  He said:  "You have already met these elements when you have found the defendant guilty of kidnapping in Count Five already.  It is the same question, it is not a trick.  It is just another way to answer the jury

---

defendant already intended to commit rape *or* oral copulation; [¶] AND [¶] 6. The other person did not consent to the movement." (Italics added.)

[21]  The instruction for the section 661.61, subdivisions (a) and (d)(2) allegation read in pertinent part:  "To prove this allegation, the People must prove that:  [¶] 1. The defendant took, held or detained Christy R. by use of force or by instilling reasonable fear; [¶] 2. Using that force or fear, the defendant moved Christy R. or made her move a substantial distance; [¶] 3. The movement of Christy R. substantially increased the risk of harm to her beyond that necessarily present in the charged oral copulations and rape; [¶] AND 4. Christy R. did not consent to the movement."

The instruction for the section 661.61, subdivision (e)(1) allegation read in pertinent part:  "If you decide the defendant guilty of the crimes charged in Counts 1, 2, and 3, the charged oral copulations and rape, you must then decide whether for each crime, the People have proved the additional allegation that the defendant kidnapped Christy R."

forms.  [¶] However, when you look at the forms it may look confusing because there are two kidnapping enhancements.  And they can both be true.  One is a basic kidnap and one is an aggravated kidnap.  [¶] Now, the distinction is a basic kidnap covers all the basic elements of moving the person.  The thing that makes it aggravated and the reason why there are two is aggravated kidnap is when the victim [*sic*] substantially increased the risk of harm to her beyond that necessarily present in the sexual offense.  That means was she moved to a place that was more dangerous.  Was she moved to a place where the defendant could better commit the crime?  [¶] Well, what do we have?  It is an aggravated kidnap because when he moved her, he moved her from the area by her friend's apartment that was out in the open.  He moved her to an area that was away from her friend's apartment to an area that was darker, to an area that was covered.  And she even told us how that was his instruction to her, 'drive to a darker place.'  [¶] So when you reach these enhancements, you check the box for both of them, the regular kidnap and the fact that it was aggravated."

The *verdict forms* for the sex counts (in addition to a finding for personal use of a firearm) contained only two enhancement findings for kidnapping--that defendant "kidnapped the victim and that the movement of the victim substantially increased the risk of harm to the victim" and that defendant "kidnapped the victim."  The trial court did not provide verdict forms for the section 667.8, subdivision (a) enhancement allegations, kidnapping to commit a sex offense.

At sentencing, the trial court imposed a one strike sentence pursuant to section 667.61, subdivisions (a) and (d)(2) of 25 years to life on Count One, oral copulation.  Pursuant to section 654, the trial court stayed the life sentence and gun enhancement on Count Five, kidnapping to commit a sex offense.  The trial court then used section 667.8 enhancement, kidnapping to commit a sex offense, to add a nine-year enhancement on Count Two, the other oral copulation count, and a nine-year enhancement on Count Three, the rape count.

40

## C. Jury Instructions on the Section 667.8 Enhancements

Defendant argues the section 667.8 kidnapping to commit a sex offense enhancements must be stricken because the jury was not instructed to find, and did not find, that those enhancements depended on separate findings that the kidnapping was for the purpose of committing the sexual offense specified in Counts Two and Three. The People contend this point was not preserved for appeal. Assuming that it was, we conclude there is no basis to strike the enhancements.

The trial court has a sua sponte duty to instruct on, and the federal Constitution requires the jury to find beyond a reasonable doubt, all elements of a sentence enhancement that increases the penalty for the crime beyond the prescribed statutory maximum. (*People v. Sengpadychith* (2001) 26 Cal.4th 316, 326.) A trial court's failure to instruct the jury on an element of a sentence enhancement (other than one based on a prior conviction) is federal constitutional error reversible under *Chapman*, unless it can be shown beyond a reasonable doubt that the error was harmless. (*Sengpadychith,* at p. 326.)

Here, the trial court failed to give a specific section 667.8 jury instruction, but did give the appropriate instruction for kidnapping to commit a sex offense in Count Five (see fn. 20, *ante*) and the two one strike allegations (see fn. 21, *ante*).

Defendant points out that the victim testified the assailant originally demanded money rather than sex. Defendant contends that the only indication of sexual intent before the kidnapping was his statement that he wanted to go someplace more secluded. But once they moved, he again asked for money. Only after his request for money was rebuffed a second time did he say, "then you're going to have to please me sexually." According to defendant, the most likely interpretation is that robbery was the primary motive and sex was an afterthought after they moved to the secluded location.

However, the jury made express findings that defendant "kidnapped" the victim in the verdicts on each of the three sex counts. Moreover, defendant's sexual "afterthought"

41

interpretation skips over the reasonable inference that his desire to go someplace more secluded was evidence of his intent sexually to assault the victim. It may be reasonably inferred there was no need for seclusion if defendant intended only a robbery, particularly after the victim had told him she had no money during the initial encounter.

Additionally, we know beyond a reasonable doubt that the jury did find defendant kidnapped the victim to commit sex offenses, because the jury found defendant guilty on Count Five, kidnapping to commit a sex offense. The instruction for Count Five required the jury to find that defendant "intended to commit rape or oral copulation" when he kidnapped the victim and that when that movement began he already intended to commit rape or oral copulation.

Defendant argues that, because the Count Five instruction was framed in the disjunctive--rape "or" oral copulation--we cannot conclude defendant kidnapped the victim to commit both rape "and" oral copulation, so the finding the jury necessarily made in finding defendant guilty on Count Five cannot be transferred to enhancements specific to Counts Two and Three. The enhancement, defendant argues, does not apply when the kidnap is for the purpose of any sex offense. Rather it applies when the kidnapping is for the sex offense to which the enhancement allegation is attached. We conclude any error was harmless.

Given the jury's verdict on Count Five, and the kidnapping findings as to Counts One, Two and Three, it is inconceivable that the jury found defendant kidnapped the victim for oral copulation but not for rape, or vice versa, or kidnapped her for one sex offense but not the other two.

Defendant thinks it is conceivable. As an apparent alternative to his sexual "afterthought" argument, he argues there was evidence to suggest that the second and third sex acts (the rape and defendant's mouth to the victim's vagina) were not part of defendant's original intent, but rather were in response to the victim's request for the perpetrator to wear a condom, which she requested sometime during the time she had

42

been made to orally copulate defendant. But the victim testified that, when she asked him to use a condom, he said, "Now that you asked me that, now I'm going to basically F you in your butt or ass now that you asked that." Had defendant sodomized the victim, he might have a stronger argument. But nothing he said suggested the actual offenses he committed, a second act of oral copulation and rape, were in retaliation for the condom request. Instead, the evidence proved defendant kidnapped the victim to commit a sexual assault involving multiple sex offenses.

We conclude any error in the jury instructions or verdict forms was harmless beyond a reasonable doubt, and there is no reason to strike the section 667.8 enhancements.

### D.  Sections 667.61 and 667.8

Defendant next contends the two section 667.8 enhancements for kidnapping to commit sex offenses on Counts Two and Three must be stayed because the kidnapping circumstance was "totally consumed" by the one-strike sentence of 25 years to life imposed on Count One (§ 667.61), and dual use is prohibited by both section 667.61 and section 654.[22] We conclude that both section 667.8 enhancements must be stayed under section 667.61, and we therefore need not address section 654 or defendant's alternative argument that at least one enhancement must be stayed because the section 667.8 allows only one enhancement per case.

At the time of the crime, section 667.61, subdivision (f) (fn. 19, *ante*) stated:  "If only the minimum number of circumstances specified in subdivision (d) or (e) which are required for the punishment provided in subdivision (a)  [25 to life]. . .  to apply have been pled and proved, that circumstance or those circumstances shall be used as the basis

---

[22]  Section 654, subdivision (a), provides, "An act or omission that is punishable in different ways by different provisions of law shall be punished under the provision that provides for the longest potential term of imprisonment, but in no case shall the act or omission be punished under more than one provision. . . ."

43

for imposing the term provided in subdivision (a) . . . rather than being used to impose the punishment authorized under any other law, unless another law provides for a greater penalty. However, if any additional circumstance or circumstances specified in subdivision (d) or (e) have been pled and proved, the minimum number of circumstances shall be used as the basis for imposing the term provided in subdivision (a), and any other additional circumstance or circumstances shall be used to impose any punishment or enhancement authorized under any other law. Notwithstanding any other law, the court shall not strike any of the circumstances specified in subdivision (d) or (e)." (Stats. 1998, ch. 936, § 9.)

Here, the pleading alleged two theories that made defendant eligible for a 25-years-to-life sentence under section 667.61, subdivision (a): (1) kidnapping with movement substantially increasing the risk of harm under section 667.61, subdivision (d)(2), which we will call "increased-risk kidnapping," and (2) two circumstances under section 667.61, subdivision (e), kidnapping under section 207 plus personal use of a firearm. (§ 667.61, subds. (e)(1) & (e)(4).)

The trial court expressly used the increased-risk kidnapping circumstance (§ 667.61, subd. (d)(2)) to impose the one-strike sentence on the Count One oral copulation. The trial court then used the gun finding to impose a firearm enhancement under section 12022.53. (*People v. Mancebo* (2002) 27 Cal.4th 735 [gun use could not be used both as a triggering circumstance for a one-strike sentence and to impose a gun-use enhancement under section 12022.5].) (*Mancebo,* at p. 744.)

Defendant argues the jury's finding of increased-risk kidnapping (§ 667.61, subd. (d)), to trigger the one strike 25-year-to-life sentence consumed that kidnapping circumstance as a sentencing factor and use of that factor to impose a nine-year sentence on any other count violates the plain language of section 667.61, subdivision (f). Section 667.61, subdivision (f) (fn. 19, *ante*) says that any "additional" circumstances, beyond what is needed for the one-strike sentence, may be used to impose enhancements under

44

any other law.  Thus, the question is whether the kidnapping in the section 667.8 enhancement is an "additional" circumstance, beyond the increased-risk kidnapping used for the one-strike sentence.  Neither side cites pertinent authority, but common sense dictates the answer is no.

The People quote *People v. Johnson* (2002) 96 Cal.App.4th 188, 196, where the court said section 667.61 will usually be applied cumulatively, and argue that *People v. Acosta* (2002) 29 Cal.4th 105, 122 (*Acosta*), supports their position.  We do not see the applicability of either case.

In *Johnson*, the trial court used the same prior conviction to impose a 25-year-to-life sentence under the one strike law (§ 667.61, subd. (a) & (d)(1)) and also to double that term under the three strikes law (§§ 667, subds. (b)-(i), 1170.12).  (*Johnson, supra,* 96 Cal.App.4th at p. 192.)  The court also used the prior conviction to double determinate sentences imposed on other counts.  In the course of holding that the trial court erred by using the prior conviction for both the one-strike sentence and to double that sentence under the three strikes law, the *Johnson* court made the observation quoted by the People here.  "[W]here only the minimum allegations have been pled and proved, they may only be used for the one strike sentence on that qualifying count unless they trigger a greater punishment under another law.  However, where additional allegations have been pled and proved, the minimum amount of allegations are to be used to first impose the one strike punishment under section 667.61, subdivision (a) and then the left over allegations must be used to impose any other punishment or enhancements authorized under any other law for that qualifying one strike offense.  [¶] *In most circumstances, this means that section 667.61 will not be exclusive, but will apply cumulatively with other laws and count[-]specific enhancements*, including the three strikes law.  Only where there is but one qualifying circumstance will the limiting language of subdivision (f) of section 667.61 preclude a cumulative sentence for the specific conviction subject to the one strike law."  (*Id.* at p. 196, italics added, disapproved on other grounds in *Acosta, supra,*  at p.

45

134, fn. 13, and superseded by statute on other grounds as stated in *People v. Lopez* (2004) 119 Cal.App.4th 355, 363.)  The court concluded that there was only one qualifying circumstance, the prior section 288 conviction.  (*Johnson, supra,* 96 Cal.App.4th at p. 196.)  However, section 667.61, subdivision (f), did not preclude imposition of three strikes terms for the other current convictions, a five-year enhancement, and enhanced terms for child molestation.  (*Johnson,* at pp. 194-206.)

The language quoted from *Johnson* does not help the People here.  Here, we address a different issue--the double use of a kidnapping circumstance.  And section 667.61, subdivision (d)(2) required the kidnapping circumstance be used as part of the increased-risk kidnapping circumstance.  Thus, it cannot also be an "additional" or "left over" circumstance available for use as part of another enhancement.

Without explanation, the People contend that *Acosta* supports their argument.  Noting that *Acosta* disapproved *Johnson* on other grounds, the People simply assert "*Acosta* at page 122 is supportive of [the People's] construction of section 667.61(f)."  But the People do not cite specific language on page 122 of the *Acosta* opinion.  We see no language in *Acosta* that helps the People and we need not further address this undeveloped argument.  (*People v. Miralrio* (2008) 167 Cal.App.4th 448, 452, fn 4.)

We conclude the section 667.8 enhancements attached to Counts Two and Three must be stayed, because the kidnapping is punished under section 667.61 (a) and (d)(2), and it is not available as an "additional" circumstance to be used for another enhancement under section 667.61, subdivision (f).  Accordingly, we modify the judgment by staying the nine-year kidnapping enhancements on Counts Two and Three, said stay to become permanent upon defendant's service of the remainder of his sentence.  (*People v. Douglas* (1995) 39 Cal.App.4th 1385, 1397.)

46

## VII.  Jail Classification And Booking Fees

Defendant argues the trial court erred in imposing a main jail classification fee ($27.22) and a jail booking fee ($242.29) under Government Code section 29550.2,[23] because he was already a state prison inmate when the current charges were filed and therefore was not arrested and booked into jail for the current case.  Instead, the trial court ordered him transferred from the prison to local custody pursuant to section 2620.

The People concede the fees were improper, and we agree.  A transfer from prison to local custody to face new charges is not an "arrest."  (*People v. Hill* (1992) 3 Cal.4th 959, 979, overruled on other grounds in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13; *People v. Aguirre* (1960) 181 Cal.App.2d 577, 580.)  A prisoner transferred under section 2620 remains in constructive custody of the prison warden.  (§ 2620; *People v. Johnson* (2004) 32 Cal.4th 260, 267.)

Accordingly, we strike the classification fee ($27.22) and jail booking fee ($242.29).

## VIII.  Custody Credits

Defendant complains the trial court failed to update credit for time served (§ 2900.5) when the court resentenced defendant on the prior robbery case (00F04732).  The People agree the case should be remanded for the trial court to calculate any credits for time served on the prior case.  So do we.

The record indicates defendant was arrested for the prior robbery when police conducted a traffic stop in May 2002.  It appears that defendant has been incarcerated

---

[23] Government Code section 29550.2 says, "(a) Any person booked into a county jail pursuant to any arrest . . . is subject to a criminal justice administration fee for administration costs incurred in conjunction with the arresting and booking if the person is convicted of any criminal offense relating to the arrest and booking. . . . [¶] (c) As used in this section, 'actual administrative costs' include only those costs for functions that are performed in order to receive an arrestee into a county detention facility [including classifying an arrestee, searching, fingerprinting, photographing, etc.]."

since 2002, but certainly no later than September 16, 2003 when he was sentenced to state prison.  Because defendant was serving a previously-imposed determinate term for a prior conviction when he was charged and convicted of the current offenses, the trial court had to resentence defendant on the prior offense.  (§§ 669, 1170.1, subd. (a); Cal. Rules of Court, rule 4.452;[24] *People v. Williams* (2007) 156 Cal.App.4th 898, 907.)  Although defendant does not get presentence credits for the current offenses (§ 2900.5, subd. (b); *In re Rojas* (1979) 23 Cal.3d 152, 155-156 [a defendant is not to be given credit for time spent in custody if during the same period he is already serving a term of incarceration]), he is entitled to have his presentence and post-sentence custody credits from the prior conviction awarded against the current aggregate term.  (§ 2900.5, subds. (a), (d) [in all felony convictions, when the defendant has been in custody, including any time spent in prison, all days of custody, including time credited under section 4019, shall be credited upon the term of imprisonment]; *People v. Saibu* (2011) 191 Cal.App.4th 1005, 1011-1013 [defendant resentenced under rule 4.452 was entitled to credits for presentence custody as well as days defendant spent in prison custody attributable to the prior commitment]; accord, *People v. Lacebal* (1991) 233 Cal.App.3d 1061.)

We cannot determine the amount of the credits from the prior robbery case, because the probation report failed to calculate them as required by rule 4.411.5(a)(10). We therefore remand with directions for the trial court to obtain a supplemental probation report accounting for all custody in the prior robbery case before the March 2010 sentencing on the current case, and for the court to award the appropriate credits for that case in an amended abstract of judgment reflecting the consolidated aggregate determinant term in this case.

---

[24] Further references to rules are to the California Rules of Court.

## IX. Prior Robbery

Finally, defendant asks us to change the abstract of judgment to show a low term sentence, rather than a consecutive term of one-third the midterm, on the robbery in the prior case (00F04732). We decline to do so.

In the prior case, defendant pleaded no contest and was ultimately sentenced to the low term, doubled, for a term of four years, plus a 20-year firearm enhancement and a five-year prior serious/violent felony conviction enhancement, for a total of 29 years.

In the combined sentencing, the trial court imposed for the prior case a subordinate term of one-third the midterm (§ 213, subd. (a)(2), doubled, for a term of two years, plus six years eight months for the gun enhancement, plus a five-year prior conviction enhancement (§ 667, subd. (a)), for a total of 13 years 8 months.

Section 1170.1, subdivision (a), states in pertinent part that, "when any person is convicted of two or more felonies, whether in the same proceeding or court or in different proceedings or courts, and whether by judgment rendered by the same or by a different court, and a consecutive term of imprisonment is imposed under Sections 669 and 1170, the aggregate term of imprisonment for all these convictions shall be the sum of the principal term, the subordinate term, and any additional term imposed for applicable enhancements . . . . The principal term shall consist of the greatest term of imprisonment imposed by the court for any of the crimes, including any term imposed for applicable specific enhancements. *The subordinate term for each consecutive offense shall consist of one-third of the middle term of imprisonment prescribed for each other felony conviction for which a consecutive term of imprisonment is imposed,* and shall include one-third of the term imposed for any specific enhancements . . . ." (Italics added.) Thus, the trial court was required to impose one-third of the *middle* term (doubled under the strike law) for that offense.

Defendant argues the trial court violated rule 4.452(3), which says, "Discretionary decisions of the judges in the previous cases may not be changed by the judge in the

49

current case. Such decisions include the decision to impose one of the three authorized prison terms referred to in section 1170(b) . . . ." Defendant apparently overlooks the commentary to rule 4.452, which reads, "The restrictions of subdivision (3) do not apply to circumstances where a previously imposed base term is made a consecutive term on resentencing. If the judge selects a consecutive sentence structure, and since there can be only one principal term in the final aggregate sentence, if a previously imposed full base term becomes a subordinate consecutive term, the new consecutive term normally will become one-third the middle term by operation of law (section 1170.1(a))."

Defendant argues it would violate the plea bargain to use the middle term now. We disagree. "When a guilty plea is entered in exchange for specified benefits such as the dismissal of other counts or an agreed maximum punishment, both parties, including the state, must abide by the terms of the agreement. The punishment may not significantly exceed that which the parties agreed upon." (*People v. Walker* (1991) 54 Cal.3d 1013, 1024.) "This does not mean that *any* deviation from the terms of the agreement is constitutionally impermissible. . . . [T]he variance must be 'significant' in the context of the plea bargain as a whole to violate the defendant's rights." (*Ibid*.)

Defendant's plea bargain in the prior case was for a total sentence of 29 years, including four years specifically for the robbery. The trial court in this combined sentencing imposed a total of only 13 years 8 months for the prior case, including only two years for the robbery.

Defendant argues in his reply brief that he does not challenge the one-third midterm sentence imposed; he merely complains the abstract of judgment shows "M" for midterm. He thinks the abstract of judgment should show the "originally selected" low term, and the fact it is being punished as a subordinate term at one-third the middle term does not change the fact that the low term was originally selected.

As the abstract currently reads, the box labeled "TERM" is appropriately marked "M," and the box labeled "CONSECUTIVE 1/3 VIOLENT" is appropriately checked.

Anticipating a finding that Count Four, the robbery conviction in the current case, is barred by the statute of limitations, defendant points out that the trial court in resentencing will have to choose a new principal term. Defendant further notes that the trial court here chose Count Four as the principal term in order to allow for fully consecutive terms on Counts Two and Three under section 667.6, subdivision (c). (*People v. Belmontes* (1983) 34 Cal.3d 335, 346 [court may select a non-667.6 offense as principal term to ensure that section 667.6 offenses receive fully consecutive terms].) Defendant hypothesizes that, upon remand, the trial court may be inclined to designate the robbery from the prior case (00F04732) as the principal term to achieve the same result. If so, he argues, it should be made clear that the sentence on that robbery count cannot be elevated above the low term.

Rule 4.452(3) would preclude changing the low term sentence previously imposed on the prior robbery case to a midterm or upper term sentence. (See Couzens, Bigelow & Prickett, Sentencing Cal. Crimes (The Rutter Group 2013), Prison Sentence with Multiple Cases, § 14:3., pp. 14-3-14-5 [The new sentencing court may not change the original selection of upper, middle or low term except when imposing consecutive sentences of one-third the midterm].)

## X. Correction of Determinate Term in the Abstract

We have noticed an error in the abstract of judgment. The abstract gives the total determinate term as 82 years 8 months instead of 92 years 8 months in box No. 8., "TOTAL TIME EXCLUDING COUNTY JAIL TERM." It appears there was a failure to add in the 10-year firearm enhancement attached to the indeterminate term imposed for the one-strike sentence on Count One. The amended abstract must reflect a total determinate term that includes the 10-year firearm enhancement on Count One.

## DISPOSITION

The judgment as to Count Four, second degree robbery, is reversed. The 15-year sentence, and the $20 court operations assessment and $30 court facility fee imposed

pursuant to Penal Code section 1465.8 and Government Code section 70373 must be vacated. We remand for resentencing.

The nine-year section 667.8 kidnapping enhancements to Counts Two and Three are ordered stayed, said stay to become permanent upon defendant's service of the remainder of his sentence.

The jail classification fee ($27.22) and jail booking fee ($242.29) are stricken.

Upon remand, the trial court shall obtain a supplemental probation report accounting for all of defendant's time in custody before the March 2010 sentencing, including time in custody on Case No. 00F04732, and award the appropriate credits for that case in an amended abstract of judgment reflecting the consolidated aggregate determinant term in this case.

The amended abstract must include in the total determinate term the 10-year sentence on the section 12022.53, subdivision (b) firearm enhancement attached to the indeterminate term imposed for the one-strike sentence on Count One.

The trial court shall forward a revised abstract of judgment to the Department of Corrections and Rehabilitation.

In all other respects, the judgment is affirmed.


      MURRAY      , J.


We concur:


    NICHOLSON    , Acting P. J.


    ROBIE       , J.